**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry Preston THOMAS, Jr.,
Defendant–Appellant.**

No. 97–1401.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 26, 1998.

Decided Feb. 5, 1999.

Robert J. Dunn (argued and briefed), Bay City, Michigan, for Defendant–Appellant.

James A. Brunson (argued and briefed), Asst. U.S. Atty., Bay City, Michigan, for Plaintiff–Appellee.

Before: JONES and COLE, Circuit Judges; O'MALLEY, District Judge.*

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Jerry Preston Thomas, Jr. appeals his re-sentencing on remand for marijuana-related convictions on the grounds that (1) the 29–month delay from remand to final sentencing violated his due process rights, (2) the district court erred in attributing 1,000 pounds of marijuana to him for sentencing purposes, and (3) the district court erred in excluding the results of a polygraph test that he took that exonerated him from the marijuana possession charges. Because we see no error in the proceedings below, we will affirm Thomas's sentence.

### I.

The facts underlying Thomas's conviction have been set forth in an unpublished decision rendered previously by this court and are sometimes repeated herein. *See United States v. Thomas, et al.,* Nos. 93–1873, 93–1905, 93–1954, 35 F.3d 567 (6th Cir. Sept. 13, 1994) (per curiam). Six defendants, including Thomas, were originally charged with multiple counts of possession of marijuana with intent to distribute in violation of 18 U.S.C. § 841(a), aiding and abetting the distribution of marijuana in violation of 18 U.S.C. § 2, and conspiring to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. According to the government, Thomas was the "broker," or marketing man, in this drug conspiracy.

At a 1993 jury trial presided over by Judge Cleland, Detective Dennis McMahan of the Saginaw Township, Michigan Police Department testified that he began to investigate the defendant's activities in October 1991. On at least eight occasions between January 28 and July 17, 1992, while working under-

cover, McMahan purchased various quantities of marijuana, ranging from four ounces to two pounds, from Thomas and a co-defendant, Antonio Vallegos. Thomas was directly involved in at least one of the sales, and accompanied his co-defendants during the other sales. McMahan's testimony was corroborated in part by taped telephone conversations between himself and Thomas, in which some of the deals were arranged. Co-conspirator Michael Castillo testified at the trial that he introduced Thomas to Vallegos, so that Thomas could purchase marijuana from Vallegos to sell to McMahan.

McMahan also testified that Norman Wilson, a paid informant, called McMahan on January 28, 1992, stating that Thomas and another defendant had obtained over 1,000 pounds of marijuana. This particular statement, however, was uncorroborated.

As was the case with most of his co-defendants, the jury found Thomas guilty as charged. In June 1993, he was sentenced to a term of 212 months' imprisonment and four years of supervised release.

Thomas and two other co-defendants subsequently appealed to this court. On September 13, 1994, we affirmed Thomas's conviction, but vacated his sentence because we found error in the district court's finding that Thomas and his co-defendants were responsible for an additional 500 pounds of marijuana. This amount, however, was separate from the aforementioned 1,000 pound shipment of marijuana. With regard to the 1,000 pound quantity of drugs, we sustained the trial court's determination that Thomas was responsible for a 1,000 pound shipment in accordance with McMahan's testimony. *See Thomas,* 35 F.3d 567.

The issuance of our opinion affirming Thomas's conviction on direct appeal was the beginning of a 29–month odyssey to reach Thomas's re-sentencing. The case was remanded to the district court on October 5, 1994, and Thomas's re-sentencing was scheduled for December 9, 1994. In the interim, however, Thomas filed a petition for rehear-

---

* The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

ing in this court, and requested the district court to postpone the re-sentencing date pending this court's ruling on the petition for rehearing. On November 30, 1994, the district court agreed to suspend the re-sentencing date until we ruled on Thomas's rehearing petition. We denied the petition for rehearing on December 8, 1994. Before the district court issued a new date for re-sentencing, Thomas filed a petition for a writ of *certiorari* in the United States Supreme Court. On April 17, 1995, the petition for *certiorari* was also denied. *See Thomas v. United States*, 514 U.S. 1074, 115 S.Ct. 1717, 131 L.Ed.2d 576 (1995). The denial of the *certiorari* petition was filed in the district court on May 1, 1995.

Meanwhile, construction for the renovation of the federal courthouse in Bay City, Michigan (where Judge Cleland sits) had begun and was not completed until November 9, 1995. During the seven-month period of construction, Judge Cleland had to utilize borrowed courtrooms and chambers in Port Huron, Flint, and Detroit. According to the government, these circumstances delayed the disposition of several of Judge Cleland's cases, including Thomas's.

Shortly after receiving the denial of Thomas's *certiorari* petition, the district court scheduled Thomas's re-sentencing hearing for May 15, 1995. For reasons not explained in the record, this hearing was canceled. Instead, as Thomas himself puts it, "nothing happened" in the case other than status hearings in July and September of 1995. Whether these hearings bore any fruit towards resolving Thomas's sentencing is not apparent from the record before us.

On January 31, 1996, Thomas moved to set aside his convictions based upon the delay in the proceedings. On February 6, 1996, the district court denied the motion to dismiss, set the re-sentencing hearing for March 7, 1996, and ordered all parties to file objections to the district court's tentative guideline determinations.[1] Thomas did not file any such objections, but instead on February 29, 1996, filed a "Renewed Motion for Dismissal for Denial of Due Process" in the district court.

On March 6, 1996, the day before the scheduled date for re-sentencing, Thomas filed a motion for an evidentiary hearing. In this motion, Thomas maintained that the district court had erroneously determined at his first trial that he was responsible for the 1,000 pound marijuana shipment. At the sentencing hearing the next day, the district court granted Thomas's request for a continuance pending the court's resolution of the motion for an evidentiary hearing. On April, 16, 1996, after ordering the government to submit a response to the motion, the district court eventually denied both Thomas's motion to dismiss and his motion for an evidentiary hearing.

While Thomas's motions were pending in the district court, he took a private, *ex parte* polygraph examination on April 5, 1996 regarding his role in the marijuana shipment. The results of this polygraph were apparently favorable. Before a new sentencing date could be scheduled, Thomas filed a motion in the district court on May 10, 1996 for an evidentiary hearing based upon the polygraph results. On August 20, 1996, Thomas filed another brief renewing the motion to admit the polygraph test results, this time relying on the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[2] On September 19, 1996, the district court denied the motion for a hearing based on the purported favorable polygraph results.

On September 26, 1996, Thomas appeared for re-sentencing. However, on that day, Thomas argued that (1) he had filed two motions to dismiss for due process/delay violations and the district court only denied one, and (2) the district court never ruled on the second motion he had filed arguing that polygraph results must be admitted pursuant to

---

1. The district court's order also dealt with several motions filed by Thomas's co-defendant, Tony Lou Garza, who was also impatient with the lack of progress in re-sentencing in the district court.

2. Under *Daubert*, expert testimony is admissible under Fed.R.Evid. 702 if it is "scientific knowledge" and if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786.

*Daubert.* Over the government's objections, the district court allowed Thomas an additional two weeks to brief the *Daubert* issue.

On November 8, 1996, six weeks later, Thomas finally filed his *Daubert* brief. The government filed its response a week after that. On December 4, 1996, the district court denied Thomas's *Daubert* request to admit the polygraph results at the sentencing hearing.

On December 17, 1996, Thomas appeared again for re-sentencing. This time, however, Thomas asserted that he now had sworn testimony from the grand jury hearing—which took place in September 1992—in which (1) a witness testified that he had never seen Thomas with a gun, and (2) the government's witnesses never stated that the transaction in question involved 1,000 pounds of marijuana. Based on this "new evidence," Thomas requested that the district court reconsider its previous finding (made sometime in 1993) that he had used a gun in furtherance of the offense. Thomas also urged the district court to reconsider its ruling on the polygraph admissibility issue. Again, over the government's objections, the district court ordered additional briefing regarding the gun and marijuana findings.

All additional briefs were filed by February 11, 1997. The district court ordered the parties to attend a new sentencing hearing to be held on March 27, 1997. On that date, the district court denied Thomas's motions to reconsider both factual findings. The district court then sentenced Thomas to 151 months' imprisonment. Thomas now appeals his new sentence to this court.

## II.

■ Thomas's first argument is that the 29–month period from the time we affirmed his conviction on direct appeal to the March 1997 date of his re-sentencing, was an unreasonable delay in violation of his Sixth Amendment rights.[3] In evaluating claims of unreasonable delay in criminal cases, the court of appeals will review questions of law *de novo* and questions of fact for clear error. *See United States v. Smith,* 94 F.3d 204, 208 (6th Cir.1996), *cert. denied,* 519 U.S. 1133, 117 S.Ct. 997, 136 L.Ed.2d 877 (1997).

Thomas's case is somewhat unusual in that he claims that due process demands a speedy re-sentencing following remand from an appellate court. We are not aware of any decision explicitly holding that the Sixth Amendment guarantees a right to a speedy re-sentencing. However, we have held that a defendant is entitled to a speedy sentencing, *see United States v. Reese,* 568 F.2d 1246, 1252–53 (6th Cir.1977), and to a speedy appeal. *See Smith,* 94 F.3d at 206–08. The government apparently has no quarrel with application of the Sixth Amendment to the circumstances in this case. As such, we will proceed accordingly.

■ In *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court set forth four factors to determine whether a trial delay is unconstitutional: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. With regard to the prejudice factor, the Supreme Court directs us to consider three interests of the defendant "which the speedy trial right was designed to protect[:] ... (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. 2182.[4]

Thomas argues that it was unreasonable for the district court not to re-sentence him until March 1997 after the case had been remanded in October 1994. He reports that

3. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. amend. VI.

4. To the extent that a defendant's appeal may be affected by a delay in sentencing, we have modified the protected interests as follows: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Smith,* 94 F.3d at 207 (quoting *Harris v. Champion,* 15 F.3d 1538, 1559 (10th Cir.1994)).

he spent most of this time in a local jail rather than the federal penitentiary, thus depriving him of extended visitation hours, as well as educational and vocational opportunities through the Federal Bureau of Prisons. While he acknowledges that some of the delay can be attributed to his filings, he contends that "nothing happened" between May 15, 1995 (the initial sentencing date after the Supreme Court denied *certiorari* on his direct appeal) and January 31, 1996 (when he filed a motion to dismiss). He further contends that a second lengthy period occurred through no fault of his own from April 16, 1996 (when the trial court denied the motions for an evidentiary hearing and to dismiss) to September 26, 1996 (the third of five dates scheduled for Thomas's re-sentencing).

The government responds that much of the delay during the first period of which Thomas complains can be attributed to the construction and renovation of the Bay City courthouse. In any event, Thomas could have been sentenced at any time after January 1996, but Thomas's own filings in the district court after that time were the sole reason for the delay in the disposition of his sentencing. The government characterizes Thomas's filings as "last-minute, irregular motions and requests" to the district court, none of which contained any new information, other than the "facts" that (1) Thomas took a private, *ex parte* polygraph examination and (2) Thomas "dug up" supposedly favorable testimony presented to a grand jury four years earlier.

 It has been said that the first *Barker* factor, the length of the delay, is a "threshold" factor. *See United States v. Sears, Roebuck & Co.,* 877 F.2d 734, 739 (9th Cir.1989). If the length of the delay is not sufficient to have resulted in prejudice towards the defendant, there is no need to consider the remaining *Barker* factors. *See Doggett v. United States,* 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (stating that "by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness"). The Supreme Court has noted that courts are generally in agreement that a delay of more than one year is "presumptively prejudicial" to a defendant. *Id.* at 652 n. 1, 112 S.Ct. 2686. We agree with Thomas that the twenty-nine month delay is lengthy. Hence, we will continue our analysis by considering the remaining *Barker* factors in this case.

Unfortunately for Thomas, we are of the opinion that the remaining *Barker* factors militate against granting him relief. The Supreme Court has termed the second factor, the reason for the delay, as the "flag all litigants seek to capture" in the *Barker* analysis. *United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). As *Barker* explained the second factor:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker,* 407 U.S. at 531, 92 S.Ct. 2182 (internal citations and footnote omitted).

Thomas does not contend and, as far as the record shows, cannot contend that the delay was attributable to any conduct on the part of the government. Indeed, the government objected when Judge Cleland postponed sentencing and ordered additional briefing when Thomas made, in the words of the district court, "a series of very late presentations" in hopes that the court would reconsider its previous finding that Thomas was responsible for the 1,000 pound shipment of marijuana. J.A. at 220.

Moreover, Thomas does not seriously dispute the government's contention that any delays outside of the May 1995–January 1996 and April 1996–September 1996 time periods are attributable to his own filings and the ordinary course of court business. While it was regrettable that the delays between those two time spans were as long as they

were, the government certainly cannot be faulted for the delays. It appears that a good portion of the delay during the latter half of 1995 was an unfortunate consequence of the Bay City courthouse construction.[5] This is clearly a "more neutral" reason and should be weighted less heavily than "deliberate" delays. Likewise, during the 1996 delay, the court had to consider at least two motions filed by Thomas relating to reconsideration of the 1,000 pounds of marijuana issue as well as the *Daubert*/polygraph issue. This delay can also be explained as the normal course of court business and, in any event, cannot be charged to the government.[6]

With regard to the other *Barker* factors, the government notes that Thomas did not assert his right to a speedy re-sentencing hearing until January 31, 1996—nearly fifteen months after we remanded the case to the district court following Thomas's direct appeal. A defendant's failure to assert his rights in a timely fashion weighs heavily against his Sixth Amendment claim. *See Barker*, 407 U.S. at 531–32, 92 S.Ct. 2182; *Sears*, 877 F.2d at 740.

■ Finally, it is beyond cavil that Thomas suffered no prejudice from the delay. First, he had already been convicted, and his conviction was affirmed on direct appeal. Second, most of his efforts at re-sentencing focused on getting the court to reconsider the propriety of charging him with the offenses relating to the 1,000 pounds of marijuana shipment. Even if that quantity were eliminated from sentencing consideration, under Sentencing Guidelines, Thomas still

would have been sentenced from anywhere to 51–78 months. Thomas even conceded this point to the district court. *See* J.A. at 48. Moreover, the only prejudice that Thomas articulates was that he was incarcerated at a local jail, rather than a federal penitentiary.[7] As the government points out, however, Thomas cites no authority holding that an incarcerated federal felon has a right to be imprisoned in a particular institution, and we decline to find any such rights here. This is true even though federal prisons generally have longer visitation hours and better educational/vocational opportunities than do local jails.

In the end, Thomas seems to be arguing that the 29 month delay in re-sentencing is per se unreasonable. However, *Barker* plainly teaches that this is not so. Because we have found that the delays were in no way attributable to the government's conduct, that Thomas did not assert his right to a speedy re-sentencing in a timely manner, and that Thomas did not suffer any cognizable prejudice from the delays, we reject Thomas's Sixth Amendment claim.

### III.

■ Thomas's second claim is that the district court erred in refusing to conduct an evidentiary hearing with respect to his claim of error in the calculation of the 1,000 pounds of marijuana attributed to him at the original trial. The court will review the district court's decision whether or not to hold an evidentiary hearing to calculate drug quanti-

---

5. While we can appreciate that the courthouse renovations caused disturbance in Judge Cleland's disposal of his cases, we do encourage trial judges to transfer cases involving incarcerated defendants to other judges with less congested calendars when it appears that disposition of the case will not occur in a timely fashion. *See United States v. West*, 504 F.2d 253, 258 (D.C.Cir. 1974) (Bazelon, C.J., concurring).

6. In some circumstances, the government may have an obligation to take affirmative steps to ensure that a defendant's Sixth Amendment rights are not violated by a delay in the disposition of his case. *See, e.g., United States v. Ailemen*, 165 F.R.D. 571, 592–93 (N.D.Cal.1996) (noting "substantial authority" requiring government to expedite pre-trial proceedings when the government has moved for detention pending

trial). However, in this case, it would be pointless to impose any obligation on the government to hasten the proceedings because there was no such action the government could possibly have undertaken.

7. The situation would be different if Thomas had not already been convicted. As the *Barker* Court recognized:

> The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time.

*Barker*, 407 U.S. at 532–33, 92 S.Ct. 2182 (footnote omitted).

ties on remand for re-sentencing for abuse of discretion. *See generally United States v. Duso*, 42 F.3d 365, 367–68 (6th · Cir.1994) (district court had discretion to hold evidentiary hearing during re-sentencing on drug quantity calculation).

As a preliminary matter, it should be noted that Thomas challenged on direct appeal the district court's finding attributing 1,000 pounds of marijuana to him. The relevant passage of this court's opinion states as follows:

On appeal, both Garza and Thomas argue that the only evidence to support the existence of the alleged 1,000 pound and 500 pound shipments of marijuana was hearsay lacking any indicia of reliability, and that the government's claim that Garza could handle between five and ten pounds of marijuana per day was pure speculation unsupported by any evidence. Thomas further argued that the information about the alleged 500 pounds indicated that it was simply part of the 1,000 pound shipment, and so it should not be counted separately. Finally, Thomas argued that he should not be held responsible for Garza's alleged 1,000 pound shipment.

We cannot fault the court for crediting McMahan's testimony that Wilson had told him about a 1,000 pound shipment. Because the court had the first-hand opportunity to observe McMahon's demeanor, and because so much of McMahan's other testimony was corroborated by other evidence in the record, it was reasonable for the court to find McMahan to be a reliable witness. A closer question is whether Wilson's statement to McMahan has sufficient indicia of reliability to support its probable accuracy. We believe that it does. The record suggests that Wilson passed a great deal of other information onto McMahan, most or all of which appeared to be accurate, and that Wilson's assistance was invaluable in obtaining evidence against the conspirators. We conclude, then, that it was not clearly erroneous for the court to hold Garza responsible for the alleged 1,000 pound shipment.

Neither was it clearly erroneous for the court to hold Thomas responsible for Garza's alleged 1,000 pound shipment. According to McMahan, when Thomas told Wilson of the 1,000 pounds, Thomas also stated that he would personally sell a part of this shipment.

*Thomas,* 35 F.3d 567.

 The government argues that the 1,000 pounds of marijuana finding is governed by the "law of the case" doctrine. *See United States v. Moored,* 38 F.3d 1419, 1421–22 (6th Cir.1994). The law of the case doctrine precludes a court from revisiting an issue where (1) the issue was expressly or impliedly decided on appeal, or (2) the appellate court's mandate to the lower court is so narrow in scope as to preclude the district court from considering the issue a second time. *Id.* at 1421. We have considered application of the law of the case doctrine to re-sentencing upon remand. As we stated in *Duso:*

If the defendant convinces a court on appeal that the sentence was wrongly computed and the court remands for resentencing, there appears to be no prohibition in the guidelines, or in the case law interpreting the guidelines, keeping a district judge from revisiting the entire sentencing procedure unless restricted by the remand order.

*Duso,* 42 F.3d at 368; *see also United States v. Crouse,* 78 F.3d 1097, 1100 (6th Cir.), *vacated on other grounds and remanded,* 419 U.S. 801, 117 S.Ct. 39, 136 L.Ed.2d 3 (1996).

In this round of litigation, Thomas reiterated his earlier arguments to the district court that the informant (Wilson) told McMahan only that "they had gotten in [sic] over a thousand pounds of marijuana." J.A. at 93. Wilson did not explicitly implicate Thomas for the 1,000 pound shipment. To the extent that our earlier decision stated that Wilson told McMahan that Thomas knew of a 1,000 pound shipment, *see Thomas,* 35 F.3d 567, Thomas contends that our finding was clearly erroneous. Similarly, Thomas argues that he "learned" from the 1992 grand jury testimony he "dug up" just prior to the fourth scheduled sentencing date in December 1996, that neither McMahon nor Wilson mentioned that the shipment in question contained 1,000 pounds of marijuana.

After the district court ordered additional briefing on the issue of whether to hold an evidentiary hearing to revisit the 1,000 pound issue, it determined that it was bound by the law of the case doctrine. Even if it were not so bound, the district court decided in the alternative that a hearing on the matter was "unnecessary and not in accord with the principle of judicial economy" because it had already ruled that the 1,000 pound shipment could be properly considered in calculating Thomas's sentence. J.A. at 135. Based on the record before us in this appeal, we cannot say that the district court abused its discretion in its ruling.

In this appeal, Thomas has not included the relevant portions of the 1992 grand jury transcript in which McMahan and Wilson purportedly neglected to mention the fact that the marijuana shipment in question was 1,000 pounds. Likewise, the only reference to Wilson's comment that "they" (not "Thomas") had over 1,000 pounds of marijuana was an isolated page from McMahan's trial testimony included in support of Thomas's motion for an evidentiary hearing. As the district court noted below, it is extremely difficult to put Wilson's comment into proper context without the benefit of other pages of McMahon's testimony. J.A. at 291.

It is obvious from reading our 1994 opinion reviewing Thomas's direct appeal that we had the luxury of a more complete record of the trial than is presented before us now. That opinion recounts the details and quotations from the trial, and is supported by citations to the joint appendix. With regard to the particular statement at issue, we noted that Wilson's statement to McMahan "has sufficient indicia of reliability to support its probable accuracy." *Thomas,* 35 F.3d 567. Our conclusion was supported by our observation-with citation to the record as was then before us that "[a]ccording to McMahan, when Thomas told Wilson of the 1,000 pounds, Thomas also stated that he would personally sell a part of this shipment." *Id.*

While it might be preferable to reconcile Wilson's statement (per McMahan's testimony) that "they had gotten ... over a thousand pounds of marijuana" with whatever portion of the trial testimony we cited in *Thomas,* we cannot fault the district court for exercising its discretion in declining to hold an evidentiary hearing on the matter. We were confronted with a similar situation in *Crouse,* and articulated the principle that we believe is fully applicable to the case *sub judice:*

> There comes a point in most cases where the relevant facts and legal positions are fully developed for the court, and beyond which further evidence and argument is an unprofitable investment. That point was reached in this case after the first appeal, when the district court was left with the administrative task of re-calculating Crouse's sentence. To turn such a task into an effort to re-litigate any of the closely-fought issues decided earlier by the district court, without substantially new evidence or argument, is contrary not necessarily to caselaw, but rather to common sense and the need for judicial economy. As the district court, in exasperation, explained at the resentencing, "none of this is new."

*Crouse,* 78 F.3d at 1103. Thomas did not present any new evidence to the district court, but instead insisted only that the district court and this court had made erroneous findings in his case. From the "evidence" Thomas presents in his current appeal, we are not convinced that our previous findings were erroneous. On a related point, the government was certainly displeased with our reversing the district court's finding that Thomas was also responsible for the additional 500 pound shipment, yet it did not seek to re-litigate the issue in the district court upon remand. Disturbing findings from earlier litigation requires more than a litigant's assertion that the previous findings were "just wrong." Accordingly, we will uphold the district court's refusal to conduct an evidentiary hearing on the attribution of the 1,000 pounds of marijuana to Thomas.

**IV.**

█ Finally, Thomas presents an argument similar to the one previously discussed: that the district court erred when it declined to hold an evidentiary hearing with regards

to the admissibility of the privately commissioned polygraph examination he took which supposedly exculpated him from involvement in the 1,000 pound marijuana shipment. Thomas took the examination on April 5, 1996, but did not inform the government about the test (and presumably, that he had passed it) until May or early June of that year. J.A. at 166. Thus, it is clear that the government was not present when Thomas took the examination, and the government never approved the questions that were used during the examination.

■■■■ This court will review evidentiary rulings, such as whether polygraph tests should be admitted, for an abuse of discretion. *See United States v. Sherlin,* 67 F.3d 1208, 1216 (6th Cir.1995); *United States v. Blakeney,* 942 F.2d 1001, 1014 (6th Cir.1991). Thomas presents the exact same argument made by the defendant in *Sherlin*—that under the more "relaxed" admissibility standard of *Daubert,* polygraph examinations should be admissible at trials. *Sherlin,* 67 F.3d at 1216. In *Daubert,* the Supreme Court held that the restrictive "general acceptance" standard of admissibility of expert testimony in federal courts had been superseded by the more liberal standard of Fed. R.Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED.R.EVID. 702. *See Daubert,* 509 U.S. at 588–90, 113 S.Ct. 2786. Of course, *Daubert* still holds that a trial court must still serve as a gatekeeper in ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable as well. *Daubert,* 509 U.S. at 589, 597, 113 S.Ct. 2786.

■■ In addition to Fed.R.Evid. 702, a trial court is also bound by the contours of Fed.R.Evid. 403 when considering whether to admit polygraph results. *See Sherlin,* 67 F.3d at 1216; *Conti v. Commissioner of Internal Revenue,* 39 F.3d 658, 662–63 (6th Cir.1994). Rule 403 mandates that otherwise relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" In ruling on Thomas's motion to accept the polygraph results, the district court assumed that the examination satisfied the *Daubert* admissibility standard. However, the district court then determined that admitting the results into evidence would violate Rule 403, because the government did not have an opportunity to participate in the administration of the examination. J.A. at 165–66.

■■ This court has never adopted a *per se* prohibition on the introduction of polygraph evidence. *See United States v. Odom,* 13 F.3d 949, 957 (6th Cir.1994); *United States v. Barger,* 931 F.2d 359, 370 (6th Cir.1991). We do, however, generally disfavor admitting the results of polygraph examinations. *See Blakeney,* 942 F.2d at 1014; *Barger,* 931 F.2d at 370; *Wolfel v. Holbrook,* 823 F.2d 970, 972 (6th Cir.1987); *United States v. Fife,* 573 F.2d 369, 373 (6th Cir. 1976). In one post-*Daubert* decision, we again expressed our long-held opinion that the results of a polygraph are inherently unreliable. *See United States v. Scarborough,* 43 F.3d 1021, 1026 (6th Cir.1994).

■■ Even if we were to assume, as did the district court, that *Daubert* called our aversion to polygraph examinations into question, we would agree with the district court that admitting the results of the polygraph in the case *sub judice* would have violated the principles of Rule 403.[8] In this

---

8. The *Scarborough* court did not consider the impact of *Daubert* on our prior precedents. We are aware that some post-*Daubert* courts in other circuits have allowed consideration of polygraph examination results. *See, e.g.,United States v. Galbreth,* 908 F.Supp. 877 (D.N.M.1995); *United States v. Crumby,* 895 F.Supp. 1354 (D.Ariz. 1995). As subsequent decisions have noted, the polygraph examinations in both *Galbreth* and *Crumby* were supported by scientific testimony.

*See, e.g., United States v. Redschlag,* 971 F.Supp. 1371, 1374–75 (D.Colo.1997) (rejecting polygraph because it was not grounded on scientific basis); *Jesionowski v. Beck,* 955 F.Supp. 149, 150–51 (D.Mass.1997) (same; distinguishing *Galbreth* and *Crumby* ). In any event, the Supreme Court has recently acknowledged that there is no consensus in the scientific community that polygraph evidence is reliable, and that there is no constitutional right to have polygraph evidence

case, Thomas took a private polygraph test administered by an examiner hired by his family, and did not inform the government of his test results until after he had taken the examination. We have repeatedly held that "unilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403." *Sherlin,* 67 F.3d at 1216, (quoting *Conti,* 39 F.3d at 663); *Wolfel,* 823 F.2d at 973–75; *Barnier v. Szentmiklosi,* 810 F.2d 594, 597 (6th Cir.1987).

As the government points out, it has no way of ascertaining whether this was the first polygraph examination administered to Thomas. Additionally, even though the polygraph results apparently indicated that Thomas's answers to questions regarding the 1,000 pound marijuana shipment supported his claims that he was not involved in the shipment, the government was unable to assist in the formulation of these questions or counter with questions about what Thomas *did* do in terms of trafficking marijuana and other controlled substances. Moreover, considering that the polygraph was administered more than three years after the events for which Thomas was questioned, the reliability of the test results is all the more dubious.

Given these circumstances, not only was it within the district court's discretion to refuse to hold an evidentiary hearing on the examination, but admitting the polygraph results would have been subject to reversal by this court. It cannot be doubted that the prejudicial effect of Thomas's polygraph results would have substantially outweighed its probative value, because Thomas had no adverse interest at stake in taking the test. *See Sherlin,* 67 F.3d at 1216–17 ("in the absence of a prior agreement between the parties that the results of an examination would be admissible, the probative value of the polygraph is substantially less because the defendant would have no adverse interest at stake

in the polygraph"); *Conti,* 39 F.3d at 663; *Barnier,* 810 F.2d at 597.

### V.

For the reasons stated herein, we find that the district court's orders below were proper. Accordingly, we **AFFIRM** Thomas's new sentence.

---

admitted at trials. *See United States v. Scheffer,* 523 U.S. 303, ——— ———, 118 S.Ct. 1261, 1265–67, 140 L.Ed.2d 413 (1998).

We have twice been presented with *Daubert* challenges to our general rule that polygraph examinations are inadmissible. *Sherlin,* 67 F.3d at 1216; *Conti,* 39 F.3d at 662–63. In those cases, we declined to address the effect of *Dau-*

*bert* on our previous holdings since we upheld the district court's rejection of the polygraph results on other grounds-that admitting the polygraph results in those particular cases would offend Rule 403. Given that we have reached the exact same result in the case *sub judice,* we will save consideration of the *Daubert* issue for another day.