NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0784n.06
Filed: September 8, 2005

No. 03-4228

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE SOUTHERN |
| v. | ) DISTRICT OF OHIO |
| | ) |
| BRUCE FRANCIS YOUNG, | ) OPINION |
| | ) |
| *Defendant-Appellant*. | ) |

BEFORE: NORRIS and BATCHELDER, Circuit Judges; MILLS, District Judge.[*]

**RICHARD MILLS, District Judge.**

On September 9, 2000, a federal grand jury returned an indictment charging

Defendant-Appellant Bruce Young with conspiracy to commit escape in violation of

18 U.S.C. § 371 ("Count I"), and with attempted escape and aiding and abetting in

violation of 18 U.S.C. §§ 2 and 751(a) ("Count III"). Following a trial, on November

_____

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

21, 2000, Young was found guilty by a jury of both counts. Young filed a motion for a new trial which was denied by the district court. On September 10, 2003, Young was sentenced to a term of 48 months imprisonment on each count, with the sentences to run concurrently. He then filed a timely notice of appeal challenging his conviction and his sentence. We **AFFIRM**.

## I. FACTUAL BACKGROUND

In April 2000, Young was being held at the Montgomery County Jail in Dayton, Ohio while awaiting trial on federal drug charges. He was housed in a section of the jail known to prison officials as "East Four South" and to prisoners as "The Range." Prisoners housed in East Four South were on a 23-hour lockdown, so they were only permitted outside of their cells for one hour each day. Despite its heightened security status, East Four South had several cells with malfunctioning locks. Cells 7, 9, and 11 were known as "pop-out" cells because the cell doors could be opened from the inside at any time by shoving the back of a hardcover book into the locking mechanism. Young was assigned to cell 3, which was not a pop-out cell. The locking mechanism in the remaining cells could sometimes be jammed, which if done properly would fool the central lock box monitored by prison guards, allowing the prisoner to exit the cell during lockdown hours. This was relatively difficult to accomplish and would not always work.

2

Prior to Young's arrival at the Montgomery County Jail, sometime in the winter of 1999-2000, three other inmates in East Four South–Terry Gallagher, Mickey Fugate, and Clennie Manning–launched a secret plot to escape from the jail. Eventually, the three men decided on smuggling in a hacksaw blade concealed in a legal pad under the guise of legal mail. They knew that legal mail was always opened in the presence of the prisoner and that it was scrutinized less closely by the guards. From inside the jail, Fugate befriended a woman named Denise Feltz, a friend of his cousin. The two began writing and eventually calling each other. Fugate was able to convince Feltz to assist in the scheme. As instructed, Feltz purchased a hacksaw blade, which she broke in half and concealed in the binding of a legal pad. She then placed the legal pad in the envelope and affixed a return address label from Gallagher's attorney, a federal public defender, which the conspirators had arranged to be delivered to her. The illicit operation was successful.

Young arrived at the Montgomery County Jail after the hacksaw blades had been delivered to the conspirators. Young was housed in cell 3. Manning was housed next to Young in cell 2 when Young arrived, but Manning was eventually able to trade cells with another inmate, Keith Reid, in order to be housed in cell 11, which was a pop-out cell. Fugate was housed in cell 9, which was also a pop-out cell. Even though Gallagher was housed in cell 6, which was not a pop-out cell, he had

3

successfully jammed the locking mechanism on his cell and was able to get out some of the time. While Fugate testified that Young's cell could not be jammed, both Manning and Reid stated that Young's cell could be jammed.

Fugate and Manning did most of the sawing on the basis that they were housed in pop-out cells. Typically, one of the men would saw the bars, while the other would serve as a look-out for the prison guards. Gallagher joined in the sawing on a couple of occasions. The men initially began sawing the bars located across from Fugate's cell (cell 9), but they found these bars very difficult to cut through. They then decided to begin sawing the bars across from cell 4, which had been sawed through before so the metal was weaker below the weld. Each time the bars were sawed, one of the men would cover the saw marks and hold the bar in place with a putty made out of soap and coffee that matched the color of paint on the bars. Young did not participate in sawing the bars, but he knew that it was occurring because the other men were sawing almost directly across from his cell.

The conspirators were able to completely saw through two of the three bars in the window in the common area of East Four South, which led to a catwalk containing another barred window leading to the outside. By then, the saw blades were substantially worn down, but Gallagher and Manning continued sawing on the third bar and were able to make significant progress. Manning indicated that the

4

conspirators believed that once on the catwalk, they could kick out the other window frame and escape the jail. The men realized that they would need a strong rope because they were on the fourth floor.

Gallagher told Manning to cut old sheets into strips and then tie the strips together while wetting the knots to make them stronger. Manning tried this but found the rope to be too weak. Manning stated that he informed Young that he did not like Gallagher's idea and that Young told him to tear the sheets into strips and braid them to make a much stronger rope. According to Manning, Young then demonstrated how to braid the sheets and said that he wanted in on the plan. Manning stated that he, Gallagher, Fugate, and Young began collecting old sheets to make the rope, and that Young agreed to actually make the rope.

Manning testified that he used a hacksaw blade to cut the old sheets into strips. He would then carry the strips in a Cheese Bits box down to Young's cell so that Young could braid the strips. Manning then brought the braided strips back to his cell and tied them together until the rope was completed. Reid testified that he had seen Manning and Fugate cutting the bars from his cell. Reid also testified that he observed Young braiding the sheets in his cell, although he stated that it was Fugate, and not Manning, who he had seen carrying the strips to Young's cell in a Cheese Bits box.

5

In May 2000, Manning decided not to go through with the escape plan, but instead to report the plot to the authorities. He claimed that his primary reason for doing so was to spare his mother hardship, but he also hoped to curry favor with the authorities and receive a reduced sentence on pending charges. Manning met with his attorney a few days after the rope had been completed, at which time he divulged the scheme and drew a diagram of East Four South identifying the location of the cut bars and the trash can across from his cell in which the conspirators had stashed the rope. Manning's attorney immediately contacted the prosecutor handling his case, and requested a meeting with her, the FBI, and the United States Marshals Service. A meeting was held and Manning's attorney received assurances that Manning would not be prosecuted for his role in the escape conspiracy. Manning's attorney then divulged everything that Manning had told him. The Marshals Service reported the information to Montgomery County Jail officials, who performed a shakedown of East Four South.

During the search, prison officials discovered the bars that had been cut through. The rope which was hidden in a trash bag at the bottom of a trash can in the common area of East Four South was also discovered. Additionally, the two pieces of the hacksaw blade were found hidden in the binding of a Bible in Manning's cell. No physical evidence was discovered in Young's cell.

It was on May 25, 2000 that Manning informed his attorney of the scheme. The following day, they met with the prosecutor, FBI agents, and representatives of the Marshals Service, as well as Montgomery County Jail prison officials. After receiving assurances that he would also not be prosecuted by state officials in exchange for his cooperation, Manning proceeded to tell everything that he knew about the escape plan, including information on every individual involved in the conspiracy.

At Young's trial, Manning and Reid testified that Young constructed the braided rope to be used in the escape. Both Manning and Reid benefitted from their cooperation. Fugate testified in Young's defense, and he stated that Young had absolutely nothing to do with the escape plot. Although Gallagher apparently showed an initial willingness to testify on Young's behalf, in an affidavit Gallagher's counsel stated, "I was informed by Assistant U.S. Attorney Richard Chema that if Mr. Gallagher cooperated with Mr. Young's defense in the conspiracy and attempted escape case, Mr. Gallagher would also be indicted and prosecuted in relation to that incident." On the advice of counsel, Gallagher thereafter refused to meet with Young's counsel or to testify for him. The prosecutor insists that Gallagher was never told that he would be indicted for his offenses, but only that it was a possibility.

Following convictions on both counts, Young has raised three issues on appeal. First, he alleges that the verdicts of guilt are against the manifest weight of the

evidence. Next, Young claims that the prosecutor violated his constitutional right to due process of law by intimidating a key witness for the defense. Finally, Young contends that the delay of nearly three years between his conviction and sentencing violated his Sixth Amendment right to a speedy trial.

## II. ANALYSIS

### A. Young's Motion for a New Trial

We first consider Young's assertion that the district court abused its discretion in denying Young's motion for a new trial because "the verdicts were against the clear weight of the evidence." Rule 33(a) of the Federal Rules of Criminal Procedure provides in pertinent part, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." While the district judge may act in the role of a "thirteenth juror" in assessing the credibility of the witnesses and the weight of the evidence to insure that there is no miscarriage of justice, our role is to determine whether the district court's ruling that the verdict was not against the weight of the evidence was an abuse of discretion. *See United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003).

In support of his argument, Young points to the fact that Fugate, an admitted conspirator, testified in Young's defense and that he had nothing to gain by doing so. While Fugate testified that Young was not involved in any way in the escape plot,

however, Manning testified that Young did indeed intend to escape with the others and that he had braided the rope to be used in the escape. Reid corroborated Manning's testimony insofar as he stated that he saw Young braiding the rope in his cell. Although Young correctly points out that the testimony of Manning and Reid is inconsistent in that Manning said that he walked the linen strips down to Young's cell while Reid testified that it was Fugate who had done so, that inconsistency is not "so egregious or extraordinary" as to warrant a finding that the district court committed a clear and manifest abuse of discretion in denying Young's motion for a new trial. *See United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998) (noting that while the defendant had argued that the verdict was against the weight of the evidence because of conflicts in the testimony, he failed to show that the conflicts were "so egregious or extraordinary" to warrant a finding that the district court abused its discretion). The inconsistency between the testimony of Manning and Reid was on a relatively minor issue. Their testimony is consistent on the central point, which is that Young provided substantial assistance in constructing the rope that the conspirators intended to use in the escape. Regarding the motives of Manning and Reid in testifying in Young's case, Young offered no credible reason why either man would truthfully divulge the details of the escape plot to the authorities but then lie about Young's involvement in it.

Young also supports his argument by asserting that he could not possibly have

escaped because he could not have gotten out of his cell. The evidence was in conflict on this issue. A prison official testified that there was constant trouble with the old doors and locking mechanisms in East Four South. Cell 3 was not a pop-out cell and Fugate did testify that Young's cell could not be jammed, but both Manning and Reid stated that Young's cell could be jammed and that it was possible that he could leave his cell even during lock down hours. It was not unreasonable for the jury or the district court to adopt the latter view. Young's argument on this issue amounts to a claim of factual impossibility. Significantly, he has only been charged with attempted escape and conspiracy to commit escape. However, factual impossibility is not a defense to attempt or conspiracy. *See United States v. Peete*, 919 F.2d 1168, 1175-76 (6th Cir. 1990) ("Under the traditional approach, legal impossibility but not factual impossibility is a defense to a charge of attempt."); *see also United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir. 1982) (noting that "it is no defense [to conspiracy] that success was impossible because of unknown circumstances") (internal quotation omitted).

Young next supports his argument by asserting that it is irrational to assume that he would have joined a scheme with little or no chance of success. He notes that the escape was "doomed" by the time he is alleged to have joined it. However, the conspirators that testified at Young's trial believed they had a chance of success.

10

Manning stated that although the blades were "worn," they were still "usable," and that the conspirators were "extremely close" to cutting the third bar out. The men also believed that the window frame next to the catwalk could be kicked out. Manning even stated that while an escape attempt would have been dangerous, "I think I could have got out and got away and got down the side of the building." The jury and the district court were convinced that Young took a substantial step toward escaping by making the rope and that he agreed to join the conspiracy. Whether the escape plot would ultimately succeed is irrelevant to attempt and conspiracy. *See Peete*, 919 F.2d at 1175-76; *Hamilton*, 689 F.2d at 1269. Young's self-serving statement that he would not have joined a "doomed" escape plot is not availing.

Finally, Young supports his argument by noting that there was no physical evidence in his cell which linked him to the crime. While that is true, the testimony of Manning and Reid represents direct evidence that Young was involved in the escape conspiracy. Moreover, some of the details of Manning's testimony were corroborated. He informed the authorities about the cut bars, the rope, and the fact that the hacksaw blades were hidden in a bible. All of these items were later discovered. It is not our role to sit as the "thirteenth juror" and re-weigh the evidence or judge the credibility of the witnesses. *See Solorio*, 337 F.3d at 589 n.6. The jury and the district court apparently found Manning and Reid to be more credible than

Fugate. We cannot say that the district court's determination that the verdict is not against the manifest weight of the evidence was a clear and manifest abuse of discretion.

### B. Young's Witness Intimidation Claim

Young next contends that his conviction should be reversed because his right to due process was violated when the prosecutor allegedly told Terry Gallagher's counsel that Gallagher would be indicted for his role in the conspiracy if he testified on behalf of the defense. Included in a defendant's right to establish a defense is his Sixth Amendment right to have compulsory process for obtaining witnesses in his favor. "This right is a fundamental element of due process." *See Washington v. Texas*, 388 U.S. 14, 18-19 (1967). Prosecutorial actions "aimed at discouraging defense witnesses from testifying deprive a defendant of this right." *See United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001). We normally review a witness intimidation due process claim for harmless error. *See id*. In this case, however, the Government contends that Young waived this argument by failing to raise it before the district court and that the issue must therefore be reviewed for plain error. *See United States v. Pierce*, 62 F.3d 818, 831 (6th Cir. 1995); *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

12

The record establishes that Young's counsel informed the district court that he wished to interview Gallagher as a potential witness, but that Gallagher's counsel informed him that Gallagher would exercise his Fifth Amendment right against self-incrimination because he had allegedly been told that if he refused to cooperate with the government, then he would be indicted for the conspiracy. From the same colloquy with the district court, it is clear that the prosecutor insisted that Gallagher was never told that he would be indicted for his offenses, but only that it was a possibility. Young's counsel never formally objected. Although the district court stated, "[W]e need to have [Gallagher's counsel] here, and we need to make a record," Young's counsel apparently did not heed that advice at the time. It was not until after Young was convicted that his counsel raised the issue again in a motion for a new trial. Young's counsel also submitted an affidavit from Gallagher's counsel at that time stating that Gallagher had expressed a willingness to testify for the defense until his counsel was told by the government that Gallagher would be indicted if he did so. The prosecutor insists that Gallagher's counsel's affidavit is not an accurate reflection of their conversation. When asked whether the government intended to call Gallagher as a witness, the prosecutor stated, "No, Your Honor, and I would say that we never told him he would be indicted. It's a possibility." In its brief, the United States claims that "the government had not made a charging decision and [merely] advised

13

Gallagher's attorney that should her client fail to testify honestly that might lead to an indictment."

In the memorandum in support of Young's motion for a new trial, he sought an evidentiary hearing and a new trial on the basis that he was prevented from adequately presenting a defense because the prosecutor's threat to Gallagher made a key defense witness "unavailable for testimony." Young then proceeded under the legal theory that the district court should grant his motion for a new trial based on "newly discovered evidence." Because Gallagher's potential testimony was known to the defense before trial, the district court correctly ruled that it did not constitute newly discovered evidence warranting a new trial. The question thus becomes whether Young's raising the factual issues surrounding the witness intimidation claim was sufficient to preserve the claim for appeal even when the specific legal theory asserted–due process violation–has clearly been raised for the first time on appeal.

While this is a relatively close issue, we conclude that the argument has been waived. Young seeks a new trial based on a due process violation, an entirely different legal theory than the newly discovered evidence theory on which he proceeded below. The district court never considered the due process argument. Because Young's counsel did not persist, therefore, a proper record was not made concerning the witness intimidation claim. As a general rule, we do not consider

14

arguments raised for the first time on appeal.  *See Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243-44 (6th Cir. 1991).  "Constitutional objections that appear for the first time on appeal are conclusively deemed to be waived."  *United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (internal quotation omitted).  Although we have recognized certain limited circumstances justifying our review of issues raised for the first time on appeal, none seem to apply here, and waiver is particularly appropriate when, as here, the newly raised issue on appeal requires additional fact finding.  *See Taft*, 929 F.2d at 244.

Pursuant to Rule 52(b), an appellate court can correct an error not raised below only if there was an error which was plain and which affected the defendant's substantial rights.  The error must also "seriously affect[] the fundamental fairness, integrity, or public reputation of judicial proceedings."  *See United States v. Trammel*, 404 F.3d 397, 401 (6th Cir. 2005).  A witness intimidation charge is a serious charge and, if proven, almost certainly warrants reversal.  Based on the record before us, however, it does not appear that plain error can be established.  While the affidavit submitted by Gallagher's counsel is troubling, the prosecutor insists that he only told Gallagher's counsel there was a possibility that Gallagher could be indicted if he perjured himself.  The fact that a prosecutor merely advises a witness of the consequences of perjury, without more, does not warrant reversal.  *See United States*

*v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995). "Where, however, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id*. (citation omitted). Basically, we are presented with two differing accounts as to what was said to Gallagher about testifying. Based on the record before us, we are unable to say that the government substantially interfered with Young's fundamental right to call a witness in his defense so as to constitute plain error.

C. Young's Speedy Trial Claim[1]

Young's final argument on appeal is that the unreasonable delay between his conviction and sentencing violated his Sixth Amendment right to a speedy trial. On November 21, 2000, Young was found guilty by a jury of conspiracy to commit escape and attempted escape. He was not sentenced by the district court until September 9, 2003–more than 33 months later. The Sixth Amendment states in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Sixth Amendment right to a

---

[1]To support its position on this issue, the United States requests that we take judicial notice of the district court proceedings in Young's drug case (No. CR-3-00-034(1)). Because Young does not challenge the reference to these court documents, which appear to be important to understanding some of the reasons for the lengthy delay in sentencing, we hereby GRANT the motion to take judicial notice of the district court proceedings.

speedy trial also applies to sentencing. *See United States v. Thomas*, 167 F.3d 299, 303 (6th Cir. 1999). In determining whether the delay was unreasonable, we review legal questions de novo and factual questions for clear error. *See id.*

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court established four factors for determining whether a trial delay is unconstitutional: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. The Court determined that none of these factors alone was a necessary or sufficient condition to a finding that the Sixth Amendment had been violated. *See id.* at 533. Rather, those factors should be balanced in such a way so that the conduct of both the prosecution and the defendant are weighed. *See id.* at 530.

Because the length of the delay in this case was more than one year, it is considered to be "presumptively prejudicial," requiring us to consider the remaining *Barker* factors. *See Thomas*, 167 F.3d at 304. Next, in assessing the reasons for the delay, a deliberate attempt to hinder the defense should weigh heavily against the government while more neutral reasons such as negligence or a crowded docket should be weighted less heavily, even though the government bears the ultimate responsibility for such delays. *See Barker*, 407 U.S. at 531. The United States argues that the delay in this case was justified because the bulk of the delay was caused by

17

Young.

Following his conviction on November 21, 2000, Young requested and received

an extension of time to file a motion for a new trial, which he then filed on December

18, 2001. On that same date, as described by the district court, Young "went berserk"

in court and directed profanity at the court and the prosecutor.[2]  He was held in

contempt for his behavior and the district court considered whether he was competent

to stand trial. *Young*, 199 F. Supp.2d at 698-700. On April 20, 2001, the district court

ordered that Young undergo a mental evaluation locally.

---

[2]After becoming angry at what Young perceived as a delay in scheduling his drug trial, the following exchange occurred:

> Defendant: This is wrong, your Honor. This is wrong. This is wrong.
> Court: Mr. Young?
> Defendant: This is wrong. It's bull shit too.
> Court: All right. Mr. Young, you have just earned yourself another six months.
> Defendant: I've got 52 fucking years coming man. I mean, what does another fucking day mean?
> Court: Get this man out of here, immediately.
> Defendant: The bitch has me pinned in a five-by-seven box for nine fucking months. This is bull shit.
> Court: We are in recess.
> Defendant: Hateful bitch.
> Courtroom Deputy Clerk: All rise.
> Defendant: Fuck this court. Fuck this court. Fuck you and I won't be back, you bitch. You're playing goddamn games.
> Marshal: Calm down.
> Defendant: Fuck the constitution, you assholes. Fucking wipe on a mother fucker. That's what you can use it for–(Defendant continued screaming "F" word comments as leaving courtroom and into the hall).

*United States v. Young*, 199 F. Supp.2d 697, 699 (S.D. Ohio 2001).

18

After receiving the results of Young's evaluation, the district court entered an order directing Young to appear on July 17, 2001, and scheduling the sentencing for his escape convictions for July 24, 2001. After engaging in the necessary colloquy with Young on July 17, 2001, the district court determined that it would allow him to represent himself at trial on the pending drug charges. On July 20, 2001, Young appeared in court again to discuss topics such as discovery procedure in preparation for his drug trial. During this appearance, Young engaged in what the district court deemed "nothing less than a psychotic rage," for which he was held in contempt.[3] As a result of this outburst, Young was not sentenced on July 24, 2001. On October 18, 2001, the district court vacated its ruling permitting Young to proceed *pro se* and its

---

[3]After the district court explained that Young would have full access to discovery materials but only at the U.S. Marshal's office, the following exchange occurred:

> Defendant: You Honor, can I go back to the jail? I am about to have an anxiety attack. I can't go on with this shit. Have the marshals take me back before I do something stupid. I'm being nice. Can I please go back?
> Court: Well, I appreciate the advance warning.
> Defendant: I'm telling, your Honor, I know myself.
> Court: Marshals, if you would.
> Defendant: I know myself. This is crazy. I can't have my fucking discovery packet. What kind of shit is that? Shit. God. You mother fuckers.
> Court: Once again Mr. Young–
> Defendant: You fucked-up asshole. You Jew bitch and bastard.
> Court: You've earned yourself another six months.
> Defendant: Fuck you. Kiss my dick. I'm not going to have my discovery packet. You've got me fucking bent, you bitch, mother fucker. Kiss my ass.

*Young*, 199 F. Supp.2d at 699-700.

finding that Young was competent to stand trial. The court ordered Young to undergo a more thorough psychological evaluation at the Federal Medical Center. *See Young*, 199 F. Supp.2d at 698.

On February 15, 2002, the district court received Young's mental evaluation and deemed him competent to stand trial. In February 2002, Young filed two motions without the aid of counsel, wherein he requested that all motions filed on his behalf by his previous counsel be withdrawn. On March 27, 2002, Young submitted a letter to the court in which he stated that he was still waiting for his transcripts so that his lawyer could file a motion for a new trial. On April 4, 2002, the district court reappointed Young's original attorney to represent him in filing the motion. The briefing was completed on May 30, 2002.

Based on the foregoing, it appears that the United States is correct that at least some of the delay is attributable to Young. Most of the delay between Young's conviction on November 21, 2000 and the completion of the briefing on Young's motion for a new trial on May 30, 2002 resulted from his outbursts in court which caused the district court to question his competency, his filing of numerous inconsistent motions, and by several changes of defense counsel. It appears that the United States is responsible for most of the fifteen-month period from May 31, 2002 until September 10, 2003. Young acknowledges, however, that "the government took

20

no affirmative action to create this extraordinary delay." He blames the delay on the district court's inattention to the case. Unintentional delay of this type should be weighed less heavily against the government. *See Barker*, 407 U.S. at 531.

The third factor under *Barker* involves whether the defendant invoked his right to a speedy trial. 407 U.S. at 533. We conclude that Young asserted his right to a speedy trial. In corresponding with the district court, Young on multiple occasions invoked his right to be sentenced in a timely manner. After he was deemed competent to stand trial the second time, Young sent the court a letter on March 27, 2002, wherein he correctly stated that "sentencing is a part of fast and speedy trial."[4]

The final factor involves whether the delay resulted in prejudice to the defendant. In making this determination, we consider the following interests of the defendant: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Thomas*, 167 F.3d at 303 n.4. Young argues that the delay worsened his conditions of confinement, caused anxiety, made an appeal of his sentence pointless, and

---

[4]During a later sentencing hearing, the district court erroneously stated that "there is no speedy trial right to a sentencing."

21

impaired his ability to present a defense if a new trial is ordered because of fading memories and passing time. However, we are unable to conclude that Young suffered any cognizable prejudice.

Young complains about various conditions of confinement. However, these appear to be the same conditions under which he was imprisoned prior to his conviction for attempted escape and the record indicates that he was subjected to somewhat harsher conditions at least in part because of his reputation as a "difficult inmate." Moreover, an incarcerated federal felon has no right to be imprisoned in a particular institution, even when another prison offers longer visitation hours and more educational and vocational opportunities. *See Thomas*, 167 F.3d at 305. We conclude that any error in the delay was harmless because Young was in prison awaiting trial on federal drug charges, to which he pled guilty to on September 25, 2003–fifteen days after he was sentenced for the escape plot. He would have been in prison the entire time anyway. Moreover, the district court gave Young a one-level decrease in his net offense level to account for the delay in sentencing.

There is no evidence that Young suffered more anxiety than any other individual would have suffered under the same circumstances. *See Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("[A]ll involuntary detention will undoubtedly engender some amount of anxiety"). During a hearing in his drug case, Young did

22

state that he was "about to have an anxiety attack." However, that July 20, 2001 hearing did not concern his sentencing. Moreover, Young would have been sentenced for his escape convictions only four days later if he had not disrupted court proceedings.

Finally, the most important interest in the prejudice inquiry concerns whether the defense was impaired by the delay. *See Barker*, 407 U.S. at 532. Because we have determined that the district court did not abuse its discretion in denying Young's motion for a new trial, however, Young's arguments that he is prejudiced because of the difficulty of locating witnesses and because of the possibility of fading memories are moot. We are unable to conclude that the delay between Young's conviction and sentencing violated his Sixth Amendment right to a speedy trial.

### III. CONCLUSION

Accordingly, for the reasons set forth above, we **AFFIRM** the judgment of the district court.