**NOT FOR FULL-TEXT PUBLICATION**
File Name: 09a0121n.06
Filed: February 12, 2009

**No. 07-3926**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

                            ON APPEAL FROM THE
v.                             UNITED STATES DISTRICT
                                 COURT FOR THE SOUTHERN
BRUCE YOUNG,               DISTRICT OF OHIO

      Defendant-Appellant.

_____/

BEFORE:    SUHRHEINRICH, GILMAN and WHITE; Circuit Judges.

       **SUHRHEINRICH, Circuit Judge.**  Defendant Bruce Young was charged with and convicted of violating 18 U.S.C. § 924 and 21 U.S.C. § 846. He raises several challenges to his conviction and sentence. We **AFFIRM.**

**I. Background**

**A. Facts**

       Young pleaded guilty to participating in a conspiracy with eleven other defendants, including Wanda Clark in the Dayton, Ohio area, to possess and distribute cocaine from mid-1997 through his arrest on April 20, 2000. Young performed a variety of "low level" functions in furtherance of the conspiracy. Young helped "break up" kilogram quantities of cocaine by mixing the cocaine with cutting agents and then repackaging the cut cocaine into smaller quantities for sale. Young also assisted in distributing the cocaine to purchasers and in collecting cash. Young assisted in the

distribution of approximately six kilograms of cocaine. Young further acted as an "enforcer." In this role, he committed acts of violence, including one occasion of shooting someone in the back.

## B. Procedural History

In April 2000, Young was indicted on one count of conspiring to distribute cocaine and one count of conspiring to discharge a firearm during and in relation to the drug conspiracy. He was detained pending trial. In September 2000, Young was separately indicted for conspiring and attempting to escape from his pretrial detention. In November 2000, Young was tried and convicted on the escape indictment. *United States v. Young*, 146 F. App'x 824, 832 (6th Cir. Sept. 8, 2005).

What follows is a description of the protracted proceedings that followed in connection with the drug case, caused by Young's obstreperous and obstructionist behavior.[1] In December 2000, Young asked to represent himself. (R.81.) On December 18, 2000, during a hearing related to the drug conspiracy indictment, Young "went berserk" and was escorted from the courtroom without a ruling on his request. *See United States v. Young*, 199 F. Supp. 2d 697, 698 (S.D. Ohio 2001).

On December 29, 2000, Young refused to leave his cell to attend a court appearance. On January 3, 2001, Young appeared with counsel, James Brookshire, and withdrew his request to represent himself. On February 7, 2001, the district court granted Brookshire's motion to withdraw.

---

[1] By the time Young was eventually sentenced, seven years had passed from the date of his arrest, he had been represented by six different appointed attorneys, and he had been evaluated by four mental health professionals.

On April 20, 2001, the district court ordered Young to undergo a mental evaluation. *Young*, 146 F. App'x at 832; *Young*, 199 F. Supp. 2d at 700. Also in the spring of 2001 the court appointed Attorney Charles Smiley.

Upon receipt of the mental evaluation, the district court directed Young to appear on July 17, 2001, and scheduled sentencing on the escape trial for July 24, 2001. On July 17, 2001, the district court declared Young mentally competent and, after a colloquy pursuant to *Faretta v. California*, 422 U.S. 806 (1975), granted Young permission to proceed *pro se* in the drug case, with Smiley acting as legal advisor. *See Young*, 146 F. App'x at 832 (noting that the district court engaged in the "necessary colloquy" with Young before allowing him to represent himself).

On July 20, 2001, in Young's first *pro se* proceeding, Young "entered into . . . nothing less than a psychotic rage" when the district court suggested that he review discovery materials in the Marshal's office rather than at the jail. *Young*, 199 F. Supp. 2d at 699.

On October 18, 2001, the district court entered a published order finding Young in criminal contempt based on the outbursts of December 18, 2000, and July 20, 2001. *See id.* The court vacated its earlier determination of competency to stand trial, remanded Young to undergo a thorough mental competency evaluation at the Federal Medical Center, revoked Young's right to self-representation, and reappointed Attorney Smiley as counsel of record. *Id.* at 700-02.

Young sent the court a letter asking it to reconsider its decision to revoke Young's right of self-representation. The district court denied the request. On November 29, 2001, Smiley moved to withdraw.

3

On February 15, 2002, the district court received Young's mental evaluation and found him competent to stand trial. *Young*, 146 F. App'x at 833. Also, Attorney Smiley was replaced by Assistant Federal Public Defender Beth Goldstein Lewis.

On July 23, 2002, Lewis moved to withdraw. On July 31, 2002, the district court granted her request, and appointed the actual Federal Public Defender, Steven Keller, as substitute counsel. On August 19, 2002, Keller moved to withdraw as counsel for Young. On November 21, 2002, the district court appointed Attorney Michael Murry to represent Young.

On September 9, 2003, the district court sentenced Young to 48 months of incarceration, after a one-level downward departure. This Court affirmed the judgment of conviction and sentence. *See Young*, 146 F. App'x 824.

On September 14, 2003, on the eve of the drug trial, Young wrote a *pro se* letter to the prosecutor, Assistant United States Attorney Margaret Quinn, offering to plead guilty if the United States would dismiss the charges against co-conspirator Wanda Clark. Young did not consult with Murry, who was counsel of record at this time. In response, Quinn met with Young in the Federal Building in Dayton, Ohio, in the Marshal's office, although Murry was not present. Quinn later testified that she met briefly with Young in the Marshal's cell block and asked him whether he was serious about pleading guilty. She explained that Murry had been in the federal building but that there had been "some confusion" and Murry had left. Quinn said that they were trying to get in touch with Murry again before Young was brought to the U.S. Attorneys' office and that she merely "went to explain that we brought him over to talk about the letter. And that was it."

Several days later, on September 25, 2003, Quinn presented the plea documents to Young and Murry in the Dayton Office of the United States Attorney. Also present were deputies from the

United States Marshal's Office as well as Wanda Clark's attorney. Young questioned Murry's presence, stating that he had fired Murry several months earlier, and refused to accept any advice from Murry. At the meeting, Quinn showed Young a statement of facts upon which his guilty pleas would be based. Young said the statement was false. Quinn explained that the Government believed it could prove those facts at trial. Young contended otherwise; he testified that Quinn told him to perjure himself when asked by the court if the facts were true.

Young also objected to a provision in the draft plea agreement that included a recommendation for an acceptance-of-responsibility adjustment, and that provision was removed. The final agreement provided that Young would enter guilty pleas to Counts 1 and 2 of the Indictment and, in return, the Government would file the attached Agreed Entry. The Agreed Entry provided that if Wanda Clark would, *inter alia*, proffer, withdraw her request for a new trial, and waive her right to appeal her conviction, the Government would file a substantial assistance motion [U.S.S.G. § 5K1.1] on her behalf and not pursue forfeiture of her residence at 144 Oaklawn Avenue in Dayton, Ohio. Young signed the plea agreement. So did Murry.[2] The change-of-plea hearing was held the same day, September 25, 2003, with Murry present. The district court stated at the outset of the hearing that "Mr Young is present in open court with counsel." Young made it clear that he had no relationship with Murry at that point and that Murry had offered his assistance but Young declined it. Young also told the district court that he told Murry that he did not want to speak with Murry, that he told Murry that he understood his rights, and that he felt that Murry was not working in Young's best interests. The district court told Young that it was his decision not to use counsel

---

[2]The agreement clearly states this arrangement at the outset: "Bruce Young, individually and through his attorney, Michael K. Murry, Esq., and the United States, by counsel, agree as follows . . . ."

and that he could change his mind. The court also explained that talking to Murry about the facts of the case might have helped in his defense at trial.

The district court read the statement of facts to Young, and Young agreed that the facts were true. The district court also explained to Young what rights he would be waiving. Further, the court explained the sentence Young was facing. Young acknowledged that he had signed the plea agreement and that no other promises had been made to him. The district court also questioned Murry about the plea agreement. Young indicated that he was pleading guilty voluntarily. When asked if he was pleading guilty because he was guilty, Young said "yes," while shaking his head "no." The court questioned the seeming contradiction, to which Young replied: "Yes. I'm guilty." Young then entered guilty pleas to Counts 1 and 2.

Two days after pleading guilty, Young wrote his probation officer, Barbara Uhling, stating that he was innocent and had been forced to plead guilty. In October 2003, he sent a similar letter to the court.

On November 19, 2003, Young filed a *pro se* motion for appointment of new counsel. Murry sent the court a letter explaining the issues he continued to face in his representation of Young, including a concern for his safety. Murry also forwarded to the court a threatening letter Young had sent to Murry.

On July 9, 2004, Young filed a *pro se* motion requesting a hearing on his allegations of government misconduct. He supplemented the motion on July 27, 2004.

On January 27, 2005, Attorney Hal Arenstein was appointed to represent Young for sentencing.

On April 18, 2005, Young filed a *pro se* motion requesting that he be permitted to withdraw his guilty pleas. The district court conducted evidentiary hearings on the motion on May 12, 2005, and July 1, 2005, and entered a decision denying the motion on May 10, 2006.

On August 8, 2006, the district court overrruled Young's *pro se* motions for a hearing on the alleged prosecutorial misconduct as moot because the court had explored the issue at the evidentiary hearings conducted on Young's request to withdraw his guilty pleas.

The presentence report ("PSR") set Young's Total Offense Level at 32 and a Criminal History Category of VI, which would result in a sentencing guidelines range of 210 to 262 months imprisonment on the drug conspiracy count. Prior to and at the time of sentencing, Young asked the district court to run his sentence concurrent to his escape sentence. The district court indicated that it could not do so because the escape sentence had already been served in full. The district court sentenced Young to 186 months' imprisonment for the drug conspiracy charge, after departing downward by 24 months based on the extensive amount of time Young spent in jail under "lockdown" conditions; 120 months' imprisonment on the 18 U.S.C. § 924(c) offense; and 6 additional months' imprisonment for the two criminal contempt charges. The net result was a total sentence of 312 months' imprisonment.

Young appeals.

## II. Analysis

### A. *Faretta* Warnings

For the first time on appeal Young argues that the trial court should have administered warnings regarding the dangers of proceeding *pro se* at the time he pleaded guilty, and that his guilty pleas should be vacated as a result.

A criminal defendant has a constitutionally protected right to present his own defense. *Faretta v. California*, 422 U.S. 806, 833-34 (1975); *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004). By exercising this right, the defendant necessarily waives his constitutional right to be represented by counsel. *Cromer*, 389 F.3d at 680. This waiver of counsel must be both knowing and voluntary. *Faretta*, 422 U.S. at 835; *Cromer*, 389 F.3d at 680.[3]

Generally, when reviewing such claims, we examine fact findings for clear error and legal conclusions de novo. *Id.* at 679. Here, however, we must determine the standard of review because Young did not object at his change of plea hearing or at any other time in the district court. Young claims that the applicable standard of review–plenary or plain error when there is no objection below–remains an open question in this Circuit, citing *United States v. McBride*, 362 F.3d 360, 365-66 (6th Cir. 2004) (noting the divergent approaches amongst various panels, but finding no need to resolve the ambiguity because the result would be the same on the facts of the case). However, as the government points out, the *McBride* rule applies to the *initial* waiver of the right to counsel. *See id.* As Young himself notes, two years before he pleaded guilty, the district court conducted a *Faretta* hearing, allowed Young to represent himself, and then a few days later revoked his right to self-representation based on Young's profane outburst. *See Young*, 199 F. Supp. 2d 697. Thus, it appears that the plain error standard applies. *Cf. McBride*, 362 F.3d at 366-67 (holding that "plain error" applied to a claim that the district court should have readministered *Faretta* warning at a later sentencing hearing "because, at the start of the sentencing proceeding, [the defendant] could have

---

[3]This Court has adopted a series of questions from 1 *Bench Book for United States District Judges* 1.02-2 to -5 (3d ed.1986) that a district court should ask the defendant to establish the defendant's waiver meets this standard. *Id.* (citing *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987)).

objected to continuing his self-representation"; further holding that a defendant's waiver of counsel at trial "carries over to subsequent proceedings absent a substantial change in circumstances").

Under the "plain error" standard of review, the defendant must demonstrate an error, that is plain, that affected his substantial rights, and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Page*, 520 F.3d 545, 546-47 (6th Cir. 2008).

The district court did not commit error, and certainly not plain error, in this case, by accepting Young's guilty pleas without a full set of *Faretta* warnings. First of all, Young was represented by counsel when he entered the pleas. The district court had revoked his right to self-representation some two years earlier. *See Young*, 199 F. Supp. 2d at 699. Young subsequently had three more attorneys appointed, and Murry, his fifth defense counsel, was present during the plea process. The district court advised Young that it would be to his advantage to cooperate with Murry, but Young made it very clear that he had decided not to use counsel. Thus, full *Faretta* procedures were not required because the district court had previously revoked Young's right to proceed *pro se* and had appointed counsel to represent him. Further, Young did not clearly and unequivocally assert his right to proceed *pro se* at that point. In *Cromer*, this Court ruled that *"Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se*." *Cromer*, 389 F.3d at 682. The rationale for that rule bears repeating here: "Requiring an articulate and unmistakable demand of the right to proceed *pro se* decreases the danger of a savvy defendant manipulating these two mutually exclusive rights to put the district court in a Catch-22." *Id*. at 683.

Nor was there prejudice, assuming any error. Young had in fact been administered the complete *Faretta* warnings two years earlier, and the court had initially allowed Young to represent

9

himself. *See Young*, 146 F. App'x at 832. Thus, Young had been properly warned about the dangers of self-representation.

Young's substantial rights were not affected. The record reflects that Young's plea was knowing and voluntary. The district court carefully followed the requirements of Federal Rule of Criminal Procedure 11, and Young does not contend otherwise. The district court read the Statement of Facts to Young, who admitted they were true.[4] Young agreed that he was pleading guilty to the two charges voluntarily because he was guilty of them. The district court specifically found that Young knowingly and intelligently waived his rights, there was a factual basis for the pleas, the pleas were voluntary, and Young was guilty as charged.

Nor were the integrity of the proceedings compromised. Young was an extremely difficult defendant. He was on his fifth attorney at the time, and the previous four had all moved to withdraw out of fear or an inability to get along with Young. He refused to cooperate with Murry. He had lost control in the courtroom on two occasions, hurling racial and religious epithets, slurs, and obscenities. *See Young*, 199 F. Supp. 2d 697. Notwithstanding these difficult circumstances, the district court meticulously ensured that Young understood the full import of pleading guilty and that Young's plea was voluntary.

In short, there is no error, plain or otherwise.

**B. Motion to Withdraw Guilty Pleas**

---

[4]Young acknowledges in his brief that the court explained the rights that he would have at trial and that he told the court that he understood and knew that he was waiving them. Appellant's Br. at 15. Rather, Young's complaint is merely that "the court did not talk to Young about the disadvantages of self representation." *Id.*

Next, Young contends that the district court erred in denying his motion to withdraw his guilty pleas. This Court reviews the denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Ellis*, 470 F.3d 275, 280 (6th Cir. 2006). A district court abuses its discretion if it relies on clearly erroneous findings of fact, improperly applies the law, uses an erroneous legal standard, or commits a clear error of judgment in its conclusion upon weighing the relevant factors. *Id.*

A defendant does not have an absolute right to withdraw a guilty plea and has the burden of proving that he is entitled to withdraw it. *Id.* To prevail, Young must show a "fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The purpose of the rule is "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty." *Ellis*, 470 F.3d at 280-81. Rather, "[w]ithdrawal is appropriate where there is a real confusion or misunderstanding of the terms of the agreement." *Id.* at 281.

This Court considers a number of non-exhaustive factors in determining whether relief under Rule 11(d)(2)(B) is appropriate. They include:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

> *Id.* (quoting *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)).

11

Applying these factors, the district court found that Young failed to offer a valid reason for waiting more than eighteen months to file his motion. Specifically, the court noted that although Young declared his innocence shortly after entering his pleas in letters to the probation officer and the court, he also indicated in those same letters that he was not attempting to withdraw his guilty pleas. Further, during a conference call in February 2005, more than sixteen months after Young had entered his guilty pleas, Young's newly-appointed counsel informed the court that Young did not want to withdraw his pleas. The court noted that despite the long delay until his actual sentencing, during which time Young was without counsel (Murry had resigned), it was clear that Young understood that he could move to withdraw his guilty pleas, given his correspondence stating that he was not seeking such relief at that time.

The district court also concluded that Young had not maintained his innocence despite the correspondence, because he had admitted his guilt under oath at the change-of- plea hearing. The court found that "Young voluntarily chose to prevent Murry from being an active participant in the events leading to his entering the guilty pleas." Thus, Young could not establish that the assistance his attorney provided was below the reasonableness standard, nor that he would not have pled guilty if his relationship with his lawyer had been better, so he could not show prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). The court found that Young had significant prior experience with the criminal justice system, having been convicted on guilty pleas of many offenses, and noted that throughout this prosecution, Young had filed many *pro se* motions and letters to the court which demonstrated a significant understanding of the legal system. Lastly, the court found prejudice to the Government because it would still be bound to honor its agreement with Wanda Clark even if Young were allowed to withdraw his guilty pleas.

12

Young claims that several factors support his motion to withdraw his pleas. First, Young claims that he did not have counsel until January 27, 2005, which caused the delay in filing the motion. Second, he said he was innocent on repeated occasions: in letters to Quinn, the court, and the probation officer; during the preparation of his PSR; and in his motion to withdraw his guilty pleas. Third, he was chronically depressed. Fourth, he had been kept in solitary confinement for years. Fifth, his pleas were induced by prosecutorial misconduct.

Young cannot show that the district court abused its discretion in denying his motion to withdraw his guilty pleas. Although Young lacked counsel from December 2003 until January 2005, as the district court noted, the record reflects that Young understood how to move to withdraw his guilty pleas, as most clearly demonstrated in his correspondence to Uhling that he was not attempting to do so.[5] Further, as pointed out by the district court, during the period of delay, the district court not only tried to obtain an attorney to represent Young, but attempted to speak with Young directly during conference calls with the Government and Murry to explain to Young the status of his prosecution. Young refused to participate in either conference call. (*Id.*)

More importantly, Young admitted in the hearing on May 12, 2005, that when he initially met with Arenstein in January 2005, he told his new lawyer that he did not want to withdraw his guilty pleas. This fact was confirmed to the court in a conference call with the court on February 9, 2005. Thus, Young cannot plausibly suggest that the delay was caused by the lack of representation.

Finally, Young eventually filed a *pro se* motion to withdraw *after* Arenstein, with whom Young got along, had been appointed. Thus, the district court did not abuse its discretion in

---

[5]The letter to Uhling states in pertinent part: "I am not making this statement in an attempt to withdraw my plea. I make it in an attempt to gain some leniency." On the other hand, the letter to the court states merely that: "I am innocent of these charges against me."

13

concluding that the eighteen-month delay between the plea and the motion was a strong factor justifying the denial of the motion. *See, e.g.*, *United States v. Valdez*, 362 F.3d 903, 912-13 (6th Cir. 2004) (holding that a seventy-five day delay justified denial of motion to withdraw, especially where the defendant's alleged criminal conduct was described at least four times prior to the entry of his guilty plea, affirmatively assented to the description three times, he discussed the indictment and plea with his attorney, and he understood English); *United States v. Durham*, 178 F.3d 796, 798-99 (6th Cir. 1999) (stating that a seventy-seven day delay was the strongest factor supporting the denial of the defendant's motion to withdraw his plea). *Cf. United States v. McCoy*, 155 F. App'x 199, 203-04 (6th Cir. 2005) (holding that the district court abused its discretion in denying the defendant's motion to withdraw his guilty plea despite a 133-day delay because the defendant notified his former counsel of his wish to withdraw the plea, his new counsel filed the motion within 45 days of being appointed counsel, the defendant expressed dissatisfaction with new counsel upon pleading guilty, and the record of the plea colloquy contained no evidence that the defendant was advised of the rights he was waiving). *See generally*, *Ellis*, 470 F.3d at 281-82 (noting that this Court has denied motions to withdraw guilty pleas where the delay was shorter than six months; listing cases). While Young declared his innocence, he also stated under oath that he was guilty and that he agreed with the statement of facts supporting his guilty pleas. Furthermore, the guilty-plea transcript reflects that the district court confirmed with Young that he understood the factual basis for the pleas, and ascertained the voluntariness of the pleas. Thus, the district court did not abuse its discretion in finding Young's assertions of innocence a "mockery" of the judicial system.[6]

---

[6]Contrary to Young's assertion in his brief, the district court did not find that Young had failed to assert his innocence. Rather, the district court noted that Young declared his innocence, but found such statements a "mockery" given his statements under oath pleading guilty.

Because Young refused Murry's assistance, the district court meticulously reviewed the facts, the voluntariness of the plea, and the nature of the rights Young was waiving. *See United States v. Murray*, 66 F. App'x 600, 604-05 (6th Cir. 2003) (holding that the district court's long colloquy in accordance with Fed. R. Crim. P. 11(d) and the defendant's responses, did not support a finding that the defendant had entered his plea with an "unsure heart and confused mind"). Moreover, Young was an experienced criminal. At the May 12, 2005 hearing on his motion to withdraw, Young admitted that he had a long criminal history and that on several occasions he had represented himself. *See Durham*, 178 F.3d at 799 (finding that the defendant's prior experience with the criminal justice system due to his conviction for bank robbery indicated that the defendant did not articulate a fair reason for withdrawing his plea). Also, the record shows that while Young has been diagnosed with antisocial personality disorder, he is an "extremely intelligent individual."

Finally, as the district court pointed out, the Government would suffer prejudice because it would still be obligated to show lenience toward Wanda Clark, even if Young did not honor his end of the bargain by withdrawing from the guilty plea. In any event, "the government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." *Ellis*, 470 F.3d at 286 (internal quotation marks and citation omitted).

For the reasons discussed *infra*, Young's claim of prosecutorial misconduct also does not support his position.

In sum, the district court did not abuse its discretion in denying Young's motion to withdraw his guilty pleas.

## C. Downward Departure

15

Young argues that the trial court erred in concluding that it could not depart downward or otherwise adjust his sentence to take into account Young's "lost opportunity" to serve his drug conspiracy sentence concurrently with his escape sentence.[7] The Government responds that (1) the district court did not misunderstand its authority, (2) Young never asked the district court to depart, and (3) even if he had asked, his argument would still be unreviewable.

A district court's decision not to depart downward is not subject to review on appeal "'unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure.'" *United States v. Puckett*, 422 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002)).[8] A district court need not explicitly state on the record that it is aware of its discretionary authority to depart downward. *Id.* at 346. And, absent clear evidence to the contrary, a district court is presumed to be aware of its discretion to depart. *United States v. Owusu*, 199 F.3d 329, 349 (6th Cir. 2000). We review the transcript of the

---

[7]In support of this theory of departure, Young cites decisions from other circuits. While they support his general theory, none applied to a departure request to impose a sentence concurrent with another sentence not deemed to be part of the instant offense. *See United States v. Barrera-Saucedo*, 385 F.3d 533, 537 (5th Cir. 2004) (holding that the district court could grant downward departure to an illegal alien for all or part of time served in state custody until he was seized by federal immigration authorities); *United States v. Sanchez-Rodriguez*, 161 F.3d 556, 563-64 (9th Cir. 1998) (en banc) (holding that a downward departure is permissible based on a defendant's lost opportunity to serve his federal sentence concurrently with his state sentence due to the delay in commencing federal proceedings); *United States v. Saldana*, 109 F.3d 100, 104-05 (1st Cir. 1997) (suggesting that such departure may be appropriate); *Cf. United States v. Lost Santos*, 283 F.3d 422, 428-29 (2d Cir. 2002) (same, but further requiring that the delay in federal prosecution must have been in bad faith or unreasonable).

[8]Rather, a discretionary denial to depart downward is reviewable only if: "(1) the sentence was imposed in violation of the law; (2) it was imposed as a result of an incorrect application of the guidelines; (3) the sentence represented an upward departure; or (4) the sentence was imposed for 'an offense for which there is no [S]entencing [G]uideline and is plainly unreasonable.'" *Puckett,* 422 F.3d at 346 (quoting 18 U.S.C. § 3742(a)).

sentencing hearing de novo in determining whether the district court was aware of its authority to depart. *United States v. Williams*, 355 F.3d 893, 901 (6th Cir. 2003).

Further, a defendant may not appeal a discretionary factor if he fails to ask the district court to exercise its discretion during sentencing. *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) (stating that "[t]here is no appealable issue saved by [*United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004)] when a defendant wishes to appeal a discretionary factor and does not request the judge to exercise such discretion during the sentencing hearing"). "Indeed . . . discretionary factors are not even appealable when discretion is requested and the judge refused or did not depart as far as the defendant wanted so long as the judge appreciated his discretion to downwardly depart." *Id.*

The record reflects that Young did not preserve this claim. Although Young asked the court both prior to and at the time of sentencing to run his sentence concurrent with his escape sentence, he did not ask the court to grant a departure or variance based on some lost opportunity. Thus, the district court's response at sentencing responds to that request and in no way reflects an inability to otherwise depart:

> The issue of how to factor in credit for the drug conspiracy case and the escape case is not an easy one, but it's been answered by the Bureau of Prisons by phone call. I have nothing in writing.
> . . .
>
> I don't have the power at this point to impose a concurrent sentence. Number one, the escape charge has been served, and I can't impose a sentence concurrent with a sentence already served. I can't backdate this sentence to run it concurrent. That would be an illegal sentence."

Young does not dispute that the court's statement is correct. (*See* Appellant's Br. at 27.) Absent a specific request for a downward departure or variance due to a lost opportunity to run sentences

17

concurrently, it is hard to see how the district court was somehow confused about its authority to do so, *since that was not the issue it was asked to address*.

Although Young objected to the inclusion of the escape conviction in his criminal history score, he never asked the court to grant a departure based on the fact that his drug conspiracy and escape sentences could no longer run concurrently. At the sentencing hearing, counsel for Young actually stated during the course of arguing his objections to the pre-sentence report that "later on" he would be asking the court to "at least give him credit for time served because it is part and parcel of the original conspiracy." Young made this statement in the context of arguing that the escape conviction should not be included in Young's criminal history score. However, Young never actually asked the court for such credit based on a "lost opportunity." Young referred to the "lockdown" conditions in the local jails prior to his sentencing, but this was in the context of explaining his behavioral problems in jail. Young also alluded to the fact that he had been continuously incarcerated for seven years, but this again was in the context of explaining his behavioral problems in prison and the courtroom. In any event, Young received a twenty-four month variance for the time spent under these conditions. This was in addition to a one-level downward departure for delay in sentencing in his escape case. Finally, though Young objected to the court's inclusion of the escape conviction in his criminal history score, at no time did Young argue that he should receive some sort of departure or credit based on the fact that his drug conspiracy and escape sentences could no longer run concurrently. Thus, the court's failure to grant a departure on a discretionary factor is not appealable. *See Simmons*, 501 F.3d at 624.

At the same time, the limitation on appellate review of a denial of a downward departure does not prevent this Court from "review[ing] the overall reasonableness of sentences." *McBride*, 434

18

F.3d at 474-75, 476 n.4, 476-66.  *See also United States v. Gale*, 468 F.3d 929, 937 (6th Cir. 2006) (explaining that this Court "can consider the bases for the underlying requests [for downward departures] within the framework of our review of the remaining § 3553(a) factors"); *United States v. Jones*, 445 F.3d 865, 868-69 (6th Cir. 2006) (noting that *McBride* limited the holding of *Puckett* to situations where the defendant did not properly argue for reasonableness review on appeal; stating that *Puckett* and similar cases do "not prevent [appellate] review of a defendant's claim that his sentence is excessive based on the district court's unreasonable analysis of the [18 U.S.C. §] 3553(a) factors in their totality"; internal quotation marks and citation omitted).

Young suggests in his brief on appeal that his sentence is not reasonable because the sentence "fails to properly reflect § 3553(a) considerations."  Appellant's Br. at 28 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)).

This Court reviews a district court's sentencing determination for reasonableness, using an abuse-of-discretion standard.  *United States v. Alexander*, 543 F.3d 819, 821 (6th Cir. 2008).  This reasonableness inquiry involves both procedural and substantive components.  *Id.* at 821-22.  In assessing procedural reasonableness, we look to see if the district court properly calculated the guidelines range, treated the guidelines as advisory, considered the § 3553(a) factors, and adequately explained the sentence, including an explanation for any variance from the guidelines range.  *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008).

As for substantive reasonableness, the overall concern is whether the district court imposed a sentence sufficient, but not greater than necessary, to comply with the purposes of the statutory sentencing scheme.  18 U.S.C. § 3553(a); *Alexander*, 543 F.3d at 822.  A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible

19

factors, fails to consider the relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor. *Presley*, 547 F.3d at 631.

The district court's decision is procedurally reasonable. The court gave Young a net offense level of 32, and a Criminal History Category of VI, resulting in an advisory sentencing guidelines range of 210-262 months on the drug conspiracy charge and a mandatory ten-year consecutive sentence on the gun charge. The court then stated that it was "[p]utting aside for a moment the advisory non-binding guideline range . . . and looking at the other factors that this Court must consider in Section 3553(a)."

The court also considered the § 3553(a) factors. The court noted that Young had an abusive childhood, had been on his own since age eleven, had been diagnosed by four mental health professionals with antisocial personality disorder and dysthymia, that he had some substance abuse problems, and that he had a GED and a minimal work record. The court noted Young's impulsivity and high IQ. *See* 18 U.S.C. § 3553(a)(1) (directing district court to consider the nature and circumstances of the offense and the history and characteristics of the defendant). The court observed that the crimes set forth in the Statement of Facts "were serious and resulted in the facilitation of a drug conspiracy through [Young's] commission of a variety of low-level functions, and that restitution was not at issue." *See* 18 U.S.C. § 3553(a)(2)(A) (stating that sentence should reflect the seriousness of the offense). The court considered "deterring this Defendant and others from committing similar offenses," and expressed concern for the safety of the community, because Young "has a low tolerance for stress which causes him to act out in what this Court feels to be a dangerous manner." The court added that because of his mental health issues, Young "presents a danger of recidivism that no length of prison sentence can control once he is released." *See* 18

U.S.C. § 3553(a)(2)(B), (C) (adequate deterrence and public safety from further crimes of the defendant). The district court also considered Young's need for "intensive introspection in therapy, group and individual" but decided to order supervised release for life because it was not convinced that treatment would be available in prison for Young or that Young would participate if it were available. *See id.* § 3553(a)(2)(D). In imposing a lifetime of supervision, the court further ordered that at year five Young be given a comprehensive psychological evaluation to assess whether he no longer represented a danger to the community, and if not, that supervision terminate at that point. The court considered Young's diabetes, stating that if he took care of himself, he should be able to complete his sentence. *See* 18 U.S.C. § 3553(a)(2)(D).

The court indicated that it would recommend to the Bureau of Prisons that Young receive all allowable presentence jail time; that he be enrolled in a 500-hour residential drug treatment program; that he receive a mental health assessment and mental health counseling and that he be made eligible for the Brave program or Code program; and that the Bureau of Prisons examine his medical condition and prescribe the appropriate diet.

The district court did not explicitly address § 3553(a)(5), which requires the district court to consider any pertinent policy statements. However, the court stated that it had considered the sentencing objectives set forth in § 3553(a) prior to granting the variance.[9] The court explained that it was granting a twenty-four month variance:

> First of all, I see, considering all of these factors, the advisory sentencing guideline range for Count 1, the mandatory nature of Count 2, which is to be served

_____

[9]The district court did not explicitly consider § 3553(a)(5) (any relevant policy statements). However, U.S.S.G. § 5K2.23, which authorizes courts to depart downward if the defendant has already served a term of imprisonment for relevant conduct, did not apply because the district court determined that the escape conviction was not relevant conduct.

21

consecutively, and considering all of the other factors that I must consider in sentencing under Section 3553(a), I can conceive of one basis to depart downward slightly from the advisory non-binding sentencing guideline range and that is this. Whether it's 100 percent his fault, 80 percent his fault, 75 percent his fault, 50 percent his fault, whether it was because of absolute stubbornness, or simply someone trying to defend himself and preserve his rights, this Defendant did spend a period of time on the drug conspiracy charge under some dire circumstances. He spent, exclusive of the credit given on the escape charge, about three years and seven months on 23-hour-a-day lockdown with only one hour to walk about and to exercise. That's 43 months. The Court considers that period of time to be hard time.

The Court, therefore, will take 24 months out of that period of 43 months and reduce the minimum on the lower end of the advisory guideline range by 24 months, from 210 months to 186 months, or 15 years, 6 months for which the Defendant will receive the 3 years and 7 months credit.

In short, there is "sufficient evidence in the record to affirmatively demonstrate the court's consideration of" the § 3553(a) factors. *See Jones*, 445 F.3d at 869.

The record in this case clearly establishes that the sentence imposed was substantively reasonable. We afford great deference to a district court's determination that a particular sentence is appropriate because the sentencing judge is in a superior position to find facts and judge their weight under § 3553(a). *Presley*, 547 F.3d at 630. Young has a long violent criminal history, a criminal history category of VI, and had been diagnosed with antisocial personality disorder. *Cf. Alexander*, 543 F.3d at 826 (rejecting the defendant's argument that his criminal history was of a "petty nature" that justified a sentence lower than 360 months because the defendant was still a career offender). The district court carefully examined the relevant factors under § 3553(a) and sentenced Young to over 300 months in prison and a lifetime of supervised release, despite its general concern that "our criminal justice system is not correcting but rather it is punishing exclusively and is manufacturing far more criminals . . . than it is correcting." At the same time, the court granted Young a 24-month variance for his lockdown time in addition to a one-level downward

departure for delay in sentencing in his escape case. In short, the record demonstrates that the district court imposed "a sentence sufficient, but not greater than necessary, to comply" with the purposes of 18 U.S.C. § 3553(a).

## D. Relevant Conduct

Young argues that his escape conviction should have been considered relevant conduct and not counted for purposes of calculating Young's criminal history. In support, Young claims that the main government witness at his escape trial, Clennie Manning, testified that the reason Young wanted to escape was to murder witnesses against him and his co-defendants in the drug conspiracy case.

Under the Guidelines, prior sentences in cases related to the offense of conviction are not counted as a prior sentence, but instead deemed relevant conduct to the instant offense under §1B1.3.[10] U.S.S.G. § 4A1.2, cmt. n.1. Section 1B1.3 of the United States Sentencing Guidelines states that relevant conduct is "all acts and omissions committed, aided, abetted, counseled, . . . or willfully caused by the defendant; and . . . that occurred during the commission of the offense of conviction, . . . or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The determination of whether a "prior sentence" "is part of the instant offense" for purposes of § 4A1.2(a)(1) depends upon whether the conduct is severable into two distinct offenses. *United States v. Beddow*, 957 F.2d 1330, 1338 (6th Cir. 1992). "This is necessarily a fact-specific inquiry that involves more than just a consideration of the elements of the two offenses. Factors such as temporal and geographical proximity of the two offenses, common

---

[10]Young was sentenced under the 2002 edition of the U.S. Sentencing Commission Guidelines Manual.

victims, and a common criminal plan or intent must also be considered." *Id.* This Court reviews the district court's factual findings under a clearly erroneous standard of review. *Id.*

At sentencing the district court found that Young had been arrested and held on the drug conspiracy charges on April 11, 2000, which marked the end of his involvement in that conspiracy. The court also found that Young attempted the escape in September of 2000 and concluded that it was a separate and distinct offense of conviction and could not be considered relevant conduct. The court rejected Manning's "testimony" as to Young's motive for attempting to escape because it "was not shown by any other than Mr. Manning's testimony and was not a significant element of the escape conviction."

First of all, although Manning testified at Young's escape trial, he never testified as to Young's motive for wanting to escape. (*See* JA 1416-48.) The references by the district court and Young to Manning's "testimony" that Young wanted to escape to kill witnesses mistakenly refers to statements Manning made in a pretrial interview statement.[11] At trial, Manning stated merely that Young "indicated he wanted to leave," and that "[h]e indicated that he didn't want to stay with us when we got on the ground, that he wanted to go his own way." In any event, the district court rejected Manning's "testimony" as uncorroborated and irrelevant to the jury's assessment of guilt. *See generally United States v. Cockett*, 330 F.3d 706, 711 (6th Cir. 2003) (noting that the district court may not make a finding that directly conflicts with the jury verdict); *United States v. Reed*, 264 F.3d 640, 648 (6th Cir. 2001) (holding that the district court could not depart below the applicable Guidelines range based on a finding that conflicted with the jury's verdict). Further, the crimes were

_____

[11]Manning's statements regarding Young's motive were apparently memorialized in a "302," a witness interview form used by the FBI. Young initially referred to this statement at the time of his guilty plea, and later in his *pro se* letter to probation officer Uhling.

five months apart, and without Manning's pretrial statement, there is no other link between the two offenses. In short, the district court's findings were not clearly erroneous.

## E. Prosecutorial Misconduct

Young also contends that his plea was induced by prosecutorial misconduct and that he was not given an adequate hearing on this issue. On July 9, 2004, Young filed a *pro se* motion for hearing on the issue of government misconduct. The motion alleged the same facts that Young alleged in his motion to withdraw his guilty plea and included transcripts of secretly recorded telephone conversations between Jack Clark and Murry. On August 7, 2006, the district court overruled Young's motion.

This argument must be rejected. As the district court held, the issue of whether Quinn told Young to commit perjury was explored at the hearings held on May 12 and July 1, 2005. Young was given a full opportunity to explore the interaction between Quinn and Young. Arenstein cross-examined Quinn, and could have called Murry regarding Murry's conversation with Young's co-conspirator.[12] Young did not offer that evidence and cannot complain at this juncture. The district court heard the contradictory testimony and credited Quinn's, remarking that "[i]t is difficult to credit

---

[12]According to Young, in those conversations, Murry corroborated statements that Young made in his motion, namely that:

–Murry agreed he played no part in the plea process;
–Murry agreed that Young asserted his innocence to Quinn and asked that the acceptance of responsibility language be removed from the plea agreement;
–Murry agreed that Quinn promised not to send Wanda Clark to jail as part of Young's plea agreement;
–Murry admitted that Young distrusted Murry's representation of Young;
–Murry said that Young's plea process was illegal;
–Murry said that Young tried to get an *Alford* plea, but Quinn refused.
Appellant's Br. at 36-37.

the testimony of an individual who has testified, under oath, to mutually exclusive propositions." *See United States v. Lawrence*, 308 F.3d 623, 627 (6th Cir. 2002) (stating that findings of fact anchored in a credibility assessment are generally not reversible on appeal, and where there are two permissible views of the evidence, the fact finder's choice cannot be clearly erroneous).

The recorded conversations between Clark and Murry add little, because, as Young admits in his brief, "Murry did not comment on Young's claim that Quinn told Young to lie." (Appellee's Br. at 36.) Again, Young could have called Murry as a witness at those hearings.

On appeal, Young also argues that Quinn's meeting with him in September 2003 without counsel being present tainted the plea process. Although imprudent, nothing in the record shows that this interaction negatively impacted the plea process. Young had initiated the contact by writing Quinn. Quinn testified that while waiting for Murry to arrive, Young was brought to the United States Attorneys office and that she "went to explain that we brought him over to talk about the letter. And that was it." She confirmed that there were no substantive discussions. All of the plea negotiations occurred in the presence of counsel. Furthermore, Young was refusing to cooperate with counsel, so it is somewhat ironic for him to claim that this limited contact with Quinn undermined any attorney-client relationship, in the absence of any intimidation by the Government. Most importantly, the district court credited Quinn's version over Young's, and there is certainly no clear error since Young's version of events contradicts his sworn admissions during the change of plea colloquy.

In sum, the district court did not abuse its discretion in denying as moot Young's motion for further evidentiary hearings on the alleged prosecutorial misconduct.

26

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.